UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

Eric Ryan Scott,

               Petitioner

v.

Najara, et al.,

               Respondents

Case No. 2:23-cv-00990-CDS-DJA

Order Denying
First-Amended Petition
28 U.S.C. § 2254

[ECF No. 15]

Petitioner Eric Ryan Scott[1] filed a counseled first-amended petition for writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 15. This matter is before this court for adjudication of the merits of the remaining grounds[2] in the first-amended petition, in which Scott alleges that his trial counsel was ineffective, the trial court erred in allowing prior bad act evidence to be admitted and refusing to give his proposed jury instruction, there was insufficient evidence to support his convictions, and there was prosecutorial misconduct. For the reasons discussed below, I deny the first-amended petition and a certificate of appealability.

I.      Background

      A.   Factual background[3]

Amanda Anderson testified that she met Scott in August 2015 and started dating him a few months later. ECF No. 21-16 at 79, 90. At the time, Anderson was pregnant with Fernando Vargas's baby. *Id.* at 90. Anderson and Scott moved in together, renting an apartment in Las Vegas, Nevada, in the spring of 2016. *Id.* at 99–100. On August 3, 2016, at around 9:00 am, Vargas came to Anderson and Scott's apartment to pick up his child. *Id.* at 114–15. Anderson told Vargas to wait in the car, but before he could leave the front porch area, Scott came to the door and told Vargas that

---

[1] The state corrections department's inmate locator page states that Scott is on parole.
[2] I previously dismissed ground 6. *See* ECF No. 35.
[3] I make no credibility findings or other factual findings regarding the truth or falsity of this evidence from the trial at the state court. My summary is merely a backdrop to my consideration of the issues presented in the amended petition.

"he should take [Anderson] to see a [mental health] doctor." *Id.* at 116. Vargas noticed some bruises on Anderson, asked Scott "why don't you hit me like you hit her," and "pushed the door open and went inside." *Id.* at 118. Vargas jumped on the couch, stating he was "taking this bitch over," and Scott went over and punched Vargas in the back. *Id.* at 119, 151. Scott then ran out the front door, and Vargas followed him. *Id.* at 120. Law enforcement eventually came to the scene, and Anderson learned that Scott has stabbed Vargas in the back rather than having merely punched him. *Id.* at 130. Anderson also testified that most of the bruises that she had at the time of this incident were not from Scott, explaining that she has "a condition with [her] blood," causing her to "bruise so easily." *Id.* at 140.

Notably, although Anderson was called by the prosecution, she was treated as a hostile witness. *Id.* at 109. In this vein, the prosecution called an investigator from the District Attorney's Office to testify about a recorded conversation between Scott and Anderson from a few days before trial. ECF No. 21-18 at 144–45. In that recording, which was played for the jury, Scott told Anderson he loved her and "discuss[ed] . . . what was to be said" at the trial. *Id.* at 150.

Vargas testified that he dated Anderson from March 2015 to August 2015. ECF No. 21-17 at 44–45. According to Vargas, Anderson "had told [him] a couple times that [Scott] had put hands on her." *Id.* at 49. Anderson told Vargas about one incident where Scott "had knocked her out and that she had waken [sic] up a little while later from it." *Id.* at 51. Vargas confronted Scott and "told him that if he continues to leave bruises on [Anderson], [he] was either going to kick his ass or call the cops on him." *Id.* at 53. On the morning of August 3, 2016, when he went to Anderson's apartment to pick up his daughter, Anderson "came out [of her apartment] a little panicked and she showed [Vargas] all her bruises that she had at the time." *Id.* at 54. Anderson told Vargas that Scott had given her the bruises. *Id.* After Scott came to the door, Vargas questioned Scott about the bruises, and Scott explained that the bruises were from him trying to restrain Anderson. *Id.* at 55. Vargas pushed Scott's face, and the two of them began punching each other. *Id.* at 55–56. Anderson eventually stopped the fight. *Id.* at 56–57. Vargas said that he was "tak[ing]

2

over this bitch," meaning the apartment, because he was not going to leave until Scott left to make sure Anderson was safe. *Id.* at 57. Scott came over and stabbed Vargas in the back, and Vargas, who did not immediately realize he had been stabbed, ran after Scott. *Id.* at 59. As Vargas was chasing Scott outside, Scott "turned around and that's when he stabbed [Vargas] in [the] stomach" and told Vargas that "he was going to kill [him]." *Id.* at 61.

Caitlin Price, Anderson's adult daughter, testified that Anderson would make up excuses for the bruises on her body, but she would eventually confide that the bruises had come from Scott. ECF No. 21-18 at 51, 60. Price also testified that she would call Vargas "because [she was] concerned about [her] mom and the bruises and what [Scott] was doing to her." *Id.* at 66.

The defense called Courtney Bruesewitz, who lived in the apartment below Scott and Anderson. ECF No. 21-18 at 156. Bruesewitz testified that she heard screaming and yelling on the morning of August 3, 2016, so she "went outside to see what was going on." *Id.* at 159. Bruesewitz saw Scott come down the stairs, and then she saw Vargas come down, carrying a kitchen knife. *Id.* at 161. According to Bruesewitz, Vargas "was chasing [Scott] out of his own house." *Id.* at 162. Bruesewitz identified Scott as her boyfriend, describing him, her, and Anderson as being in a "three-way relationship" and calling Scott the "love of [her] life." *Id.* at 166, 177.

Scott testified that Vargas accused him of "putting [his] hands on" Anderson when he first encountered Vargas on the morning of August 3, 2016. ECF No. 21-18 at 189, 195. Scott told Vargas that Anderson had "been blacking out, trying to kill herself." *Id.* at 195. According to Scott, he never hit Anderson and only held her to try to prevent her from hurting herself. *Id.* Vargas punched Scott in the face, causing a tooth to be knocked out of Scott's mouth. *Id.* at 197. Vargas then pushed the door open and continued to attack Scott. *Id.* After the men fist fought, Vargas sat on the couch. *Id.* at 198. Vargas, who never had his back to Scott, said he was going to call his brother so they could "take this bitch over." *Id.* at 199–200. Scott ran out of the apartment and Vargas followed. *Id.* at 201. A friend of Bruesewitz's happened to be in the parking lot at the time, so Scott jumped in her truck and left. *Id.* at 202. According to Scott, he never had a knife during the

3

incident with Vargas, never stabbed Vargas, and did not encounter Vargas outside of his apartment because he was able to get away before Vargas could catch him. *Id*. at 203–04.

### B. Procedural background

A jury convicted Scott of battery with the use of a deadly weapon resulting in substantial bodily harm, attempted murder with the use of a deadly weapon, and battery constituting domestic violence. ECF No. 22-6. Scott was sentenced to an aggregate sentence of 90 to 420 months. *Id*. Scott appealed, and the Supreme Court of Nevada affirmed on September 19, 2019. ECF No. 22-13. Remittitur issued on October 14, 2019. ECF No. 22-14.

Scott filed a state petition for postconviction relief on February 24, 2020. ECF No. 22-16. The state court denied Scott postconviction relief on March 8, 2021. ECF No. 22-31. Scott appealed, and on February 9, 2022, the Nevada Court of Appeals affirmed. ECF No. 23-3. Remittitur issued on March 7, 2022. ECF No. 23-4. On June 24, 2022, Scott moved to modify or correct his illegal sentence. ECF No. 23-9. The state court denied Scott's motion on November 23, 2022. ECF No. 23-17. Scott appealed, and the Nevada Court of Appeals affirmed on July 26, 2023. ECF No. 23-25. Remittitur issued on August 21, 2023. ECF No. 23-26.

Scott commenced this instant action on or about June 27, 2023. ECF No. 1. I appointed counsel for Scott, and Scott's counsel filed his first-amended petition on February 20, 2024. ECF No. 15. In his first-amended petition, Scott raised the following grounds for relief:

1a.   His trial counsel failed to sever the counts related to domestic violence from the stabbing counts.
1b.   His trial counsel failed to request DNA testing to confirm Vargas was the father of Anderson's baby.
1c.   His trial counsel failed to challenge the indictment's domestic violence charge.
1d.   His trial counsel failed to object to: (1) the State's misstatement of the law concerning self-defense, (2) the State's improper closing arguments, and (3) the State's comments designated to inflame the jury during closing.
1e.   His trial counsel failed to effectively argue Nevada's self-defense law and request a jury instruction explaining self-defense.
1f.   His trial counsel failed to impeach Vargas with his prior criminal record.
2.   The trial court allowed prior bad act evidence.
3.   There was insufficient evidence to support his convictions.
4.   The prosecutor committed misconduct during closing arguments.
5.   The trial court refused his proper jury instructions.
6.   There were cumulative errors.

Respondents moved to dismiss the first-amended petition. ECF No. 19. Scott opposed the motion, and Respondents replied. ECF Nos. 29, 30. I granted the motion, in part, finding that ground 1 was technically exhausted and procedurally defaulted and ground 6 was cognizable but unexhausted. ECF No. 31. I then granted Scott's voluntary dismissal of ground 6. ECF No. 35. Respondents filed their answer to the remaining claims in the first-amended petition on April 2, 2025. ECF No. 42. Scott replied on August 15, 2025. ECF No. 47.

**II.        Governing standard of review**

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). A state court decision is an unreasonable application of clearly established Supreme Court precedent "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires . . . [t]he state court's application of clearly established law [to] be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## III.     Discussion

### A.   Ground 1—ineffective assistance of trial counsel

In ground 1, Scott alleges six claims upon which he was denied his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments. ECF No. 15 at 5.

#### 1.   *Procedural default*

Scott previously acknowledged that grounds 1a, 1b, 1c, 1d, 1e, and 1f are technically exhausted but procedurally defaulted. ECF No. 29 at 9. However, he contended that he could demonstrate cause and prejudice to overcome these procedural defaults pursuant to *Martinez v. Ryan*. *Id*. In *Martinez v. Ryan*, the Supreme Court held that the absence or inadequate assistance of counsel in an initial-review collateral proceeding may be relied upon to establish cause excusing the procedural default of a claim of ineffective assistance of trial counsel. 566 U.S. 1, 9 (2012). Because the cause and prejudice questions of overcoming the procedural default of grounds 1a, 1b, 1c, 1d, 1e, and 1f are necessarily intertwined with the merits of these grounds, I deferred a determination of whether Scott can overcome these procedural defaults until the time of merits review. ECF No. 31. I now consider (1) whether Scott's ineffective-assistance-of-trial-counsel claims are substantial; (2) if so, whether Scott's state post-conviction counsel was ineffective in raising these claims in the state district court; and (3) if so, whether, on the merits, Scott was

denied effective assistance of trial counsel.[4] *See, e.g., Atwood v. Ryan*, 870 F.3d 1033, 1059–60 (9th Cir. 2017); *Detrich v. Ryan*, 740 F.3d 1237, 1243–46 (9th Cir. 2013). On all such issues, this court's review is de novo. *See Ramirez v. Ryan*, 937 F.3d 1230, 1243 (9th Cir. 2019).

### 2. *Consideration of new evidence*

Respondents argue that Scott is unable to rely on newly developed evidence to support ground 1. ECF No. 42 at 10.

28 U.S.C. § 2254(e)(2) provides as follows:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
> (A) the claim relies on—
>   (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>   (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

In *Shinn v. Ramirez*, the Supreme Court of the United States reinforced that when reviewing a federal habeas petition, the federal court may not consider any facts beyond the factual record presented to the state post-conviction relief court, unless one of the exceptions of § 2254(e)(2) applies. 596 U.S. 366, 382 (2022). The *Ramirez* Court also held that, with respect to procedurally defaulted claims not adjudicated on their merits in state court, the federal habeas court may not hold an evidentiary hearing or otherwise consider new evidence, either regarding the question of cause and prejudice relative to a procedural default or regarding the merits of the claim, unless the requirements of § 2254(e)(2) are met. *Id.* at 382–91.

Scott does not argue that he can meet the requirements of § 2254(e)(2). Rather, he argues that he does not need to meet these requirements because he did not "fail[ ] to develop the factual

---

[4] It has not been disputed (1) that a state post-conviction proceeding in the state district court was an initial-review collateral proceeding for purposes of *Martinez*, or (2) that Nevada procedural law sufficiently requires an inmate to present a claim of ineffective assistance of trial counsel for the first time in that proceeding for purposes of applying the *Martinez* rule. *See generally Rodney v. Filson*, 916 F.3d 1254, 1259–60 (9th Cir. 2019).

basis of [these] claim[s] in State court." ECF No. 47 at 14. In support of this argument, Scott explains that he sought—and was denied—an evidentiary hearing in state court. *Id.*

§ 2254(e)(2) applies when "there is lack of diligence . . . attributable to the prisoner." *Williams*, 529 U.S. at 432. A finding of diligence "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id.* at 435. A prisoner "is not at fault" for purposes of § 2254(e)(2) "when his diligent efforts to perform an act are thwarted . . . by the conduct of another or by happenstance." *Id.* at 432. When "[a]n indigent prisoner . . . is denied counsel and discovery[, he] has no practical likelihood of" investigating his post-conviction claims in state court. *Rodney v. Garrett*, 116 F.4th 947, 957 (9th Cir. 2024). In this situation, a petitioner has done "all that he could to develop the evidentiary bases of his . . . claims in state court," so he cannot be found to have "fail[ed] to develop the state-court record within the meaning of § 2254(e)(2)." *Id.*

Here, Scott requested that the state court provide an evidentiary hearing. ECF No. 22-25 at 6–7. The state court denied that request. ECF Nos. 22-30 at 9, 22-31 at 22–24. Because Scott diligently pursued development of the state-court record in this matter but was thwarted by the state court from doing so, I find that § 2254(e)(2) does not apply, so I am permitted to consider Scott's new evidence.

### 3. *Legal standard*

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel

made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

### 4. *Ground 1a—severance of counts*

In ground 1a, Scott alleges that his trial counsel was ineffective for failing to sever the counts related to the domestic violence of Anderson from those related to the alleged stabbing of Vargas. ECF No. 15 at 6.

Nevada law provides that "[t]wo or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged . . . are: (a) [b]ased on the same act or transactions; or (b) [b]ased on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Nev. Rev. Stat. § 173.115. After determining whether offenses have been properly joined, the trial court should then consider whether "the defendant will be unduly prejudiced" by the joinder. *Farmer v. State*, 405 P.3d 114, 121 (Nev. 2017); *see also* Nev. Rev. Stat. § 174.165(1) ("If it appears that a defendant . . . is prejudiced by a joinder of offenses . . . , the court may order an election or separate trials of counts . . . or provide whatever relief justice requires."). Separate trials are required when the joinder of offenses "render[s] the trial fundamentally unfair, and hence, result[s] in a violation of due process." *Id.* (internal quotation marks omitted). Demonstrating that joinder was manifestly prejudicial "requires more than a mere showing that severance may improve his or her chances for acquittal." *Rimer v. State*, 351 P.3d 697, 709 (Nev. 2015).

Scott fails to demonstrate that his charges was improperly joined under Nevada law, negating a basis for his trial counsel to have filed a motion for severance. Scott's physical abuse towards Anderson was the catalyst for the fight that ensued between he and Vargas. In fact, without Vargas having witnessed the bruises on Anderson's body, it appears that he would have

simply taken his daughter and left without incident. Instead, those bruises prompted Vargas to intervene and defend Anderson from Scott. This intervention prompted the fist fight and stabbing that then took place, so, under Nevada law, the domestic violence of Anderson and the stabbing of Vargas were "connected together" and properly joined. Nev. Rev. Stat. § 173.115.

And even if Scott's trial counsel could have made a colorable argument that joinder of the charges was prejudicial, Scott fails to demonstrate prejudice under *Strickland. See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986) (explaining that in alleging that counsel failed to file a pretrial motion, the petitioner must establish a reasonable probability that the motion would have been granted). Here, "[t]he decision to sever is within the discretion of the district court." *Floyd v. State*, 42 P.3d 249, 255 (Nev. 2002). And the trial court was required to weigh the prejudice of joinder against "the dominant concern [of] judicial economy." *Tabish v. State*, 72 P.3d 584, 591 (Nev. 2003). Given this weighing test, Scott fails to demonstrate that the trial court would have been compelled to sever the charges, especially given that the following implications of prejudice have *not* been shown: (1) the evidence of Scott's guilt as to one set of charges was stronger than the other set of charges, (2) Scott wished to testify in his defense on only one set of charges but not the other, or (3) the cumulation of evidence lessened Scott's presumption of innocence. *Rimer*, 351 P.3d at 709. Rather, there was substantial evidence of Scott's guilt to both sets of charges, nullifying any prejudice, and any potential prejudice could "be adequately addressed by a limiting instruction to the jury." *Id.* As such, Scott fails to demonstrate that the trial court would have granted a motion to sever had Scott's trial counsel filed one.

In sum, because Scott's ineffective assistance of trial counsel claim is not substantial due to his failure to demonstrate ineffectiveness under *Strickland*, Scott fails to overcome the procedural default of ground 1a. Ground 1a is dismissed.

### 5. *Ground 1b—DNA testing*

In ground 1b, Scott alleges that his trial counsel was ineffective for failing to request DNA testing to confirm Vargas was the father of Anderson's baby. ECF No. 15. According to Scott, the

fact that Vargas was the father of Anderson's baby—a fact that was later disproven—allowed the State to justify Vargas entering Scott's home without permission, which undermined Scott's theory of self-defense. *Id.*

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Additionally, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* This investigatory duty includes investigating the defendant's "most important defense." *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994). It also includes investigating and introducing evidence that demonstrates factual innocence or evidence that raises sufficient doubt about the defendant's innocence. *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999). In assessing counsel's investigation, the court must conduct an objective review of counsel's performance, measured for "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. This includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time." *Id.* at 689; *see also Wiggins v. Smith*, 539 U.S. 510, 523 (2003).

Scott fails to demonstrate that his trial counsel failed to fulfil these investigative duties. Even though Vargas was apparently later proven not to be the father of the baby, this would not have changed the fact that Vargas believed the baby was his at the time of the altercation. Because Vargas's belief—not the factual reality—about the baby's parentage was the premise upon which the prosecution argued that he entered Scott's home, Scott's trial counsel had no fruitful basis upon which to request a DNA test. In fact, such an investigation and argument could have backfired into the jury feeling sorry for Vargas given that, at a post-trial hearing, the prosecution stated that Vargas "sadly learned" that he was not the father of the baby. ECF No. 21-42 at 10. Consequently, because Scott's ineffective assistance of trial counsel claim is not substantial due to his failure to demonstrate ineffectiveness under *Strickland*, Scott fails to overcome the procedural default of ground 1b. Ground 1b is dismissed.

### 6. *Ground 1c—challenge indictment*

In ground 1c, Scott alleges that his trial counsel was ineffective for failing to challenge the felony domestic violence charge in the information. ECF No. 15 at 10. Specifically, Scott alleges that the convictions used to enhance his domestic violence charge to a felony were invalid, explaining that his brother Andre Scott's convictions were listed in his information. *Id.* Scott's support for this ground comes from: (1) a declaration by Scott's brother Stanley Scott, who stated that "Andre had falsely provided Eric's name to police in lieu of his own on more than one occasion," (2) a declaration by a Federal Public Defender investigator who reported that the victim of the domestic violence incidents reported that they were committed by Andre Scott rather than Eric Scott, and (3) his own statements from his state habeas petition. ECF Nos. 16-5, 16-6, 23-9. Respondents rebut that (1) Scott's new evidence is hearsay and would not have been admissible at trial, and (2) Scott fails to demonstrate that Andre exists, explaining that Scott often went by the name Andre or Dre. ECF No. 42 at 17–19.

In the prosecution's amended information, Scott was charged with battery constituting domestic violence. ECF No. 21-12 at 3. That information stated that Scott had "committed the offense of Battery Constituting Domestic Violence at least two times within seven (7) years immediately preceding the date of the principle offense or after the principle offense charged herein, to-wit:" (1) a conviction on January 21, 2014, in case number 13FN2259X in the North Las Vegas Justice Court, and (2) a conviction on October 13, 2011, in case number 11M42637X in the Las Vegas Justice Court. *Id.* These two other domestic violence convictions were necessary to enhance Scott's instant domestic violence charge into a felony. *See* Nev. Rev. Stat. § 200.485(1)(c).

Scott fails to demonstrate that his trial counsel acted deficiently regarding the domestic violence charge in the information or that any prejudice resulted therefrom. First, it is unclear whether Andre Scott exists, especially since Scott's new evidence does not include anything from Andre Scott himself. Moreover, as the respondents note, many witnesses referred to Scott as Andre or Dre during the trial, implying that Eric Scott and Andre Scott are the same person. *See* ECF Nos.

21-16 at 85 (testimony by Anderson that Scott goes by Dre), 21-18 at 52 (testimony by Price that Scott goes by Dre), and 93 (testimony by law enforcement that Scott identified himself as Dre). Second, even if Andre Scott is real, there is nothing in the record to demonstrate that Scott's trial counsel was aware of the information confusing Scott and his brother, negating a finding that Scott's trial counsel had a basis to investigate. *See Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) ("[C]ounsel is not deficient . . . if, after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence."). Finally, at his sentencing hearing, Scott admitted that he "had two previous domestics." ECF No. 21-42 at 15. Thus, even if Andre Scott is real and his domestic violence convictions were mistakenly included in Scott's information, Scott still had his own domestic violence convictions to enhance his instant domestic violence charge to a felony.

Because Scott's ineffective assistance of trial counsel claim is not substantial due to his failure to demonstrate ineffectiveness under *Strickland*, Scott fails to overcome the procedural default of ground 1c. Ground 1c is dismissed.

### 7. *Ground 1d—object to prosecutorial misconduct*

In ground 1d, Scott alleges that his trial counsel was ineffective for failing to object to prosecutorial misconduct. ECF No. 15 at 11. Specifically, Scott alleges that the prosecution (1) misstated the law concerning self-defense in Nevada, (2) made improper closing arguments, and (3) made comments designed to inflame the passions of the jury during closing remarks. *Id.* at 11–15.

First, during closing, the prosecution made the following comments about Vargas entering the home:

> Amanda told him the Defendant didn't live there. She showed him the bruises and said the Defendant did it. Fernando had every right to defend and protect Amanda and his baby. Regardless of what's going on or where it's going on, it – it's – it's unclear at this point whether he had a right to the place, he didn't have a right to the place as -- as discussed a little bit later, it appears they all may have been squatting on some level and maybe nobody had a legal right to be -- to the place. But in any event, you're allowed to go in anywhere to protect people that you care about, protect others, whether it be Amanda or his two and a half month old baby that was in the back bedroom. He had every right to be there. He had every right to be sure

13

that the Defendant left because Amanda told him that's what he -- she wanted. She wanted him out and he didn't need to leave the Defendant where he could further hurt her.

ECF No. 21-22 at 95. Scott argues that this was a misstatement of Nevada Revised Statute § 200.120. ECF No. 15 at 12. Under Nevada Revised Statute § 200.120(2), "[a] person is not required to retreat before using deadly force . . . if the person: (a) [i]s not the original aggressor; (b) [h]as a right to be present at the location where deadly force is used; and (c) [i]s not actively engaged in conduct in furtherance of criminal activity at the time deadly force is used." That fact that Scott may or may not have been permitted to stand his ground and not retreat under Nevada law is independent of Vargas's right to enter the home, meaning that Scott's trial had no reasonable basis to object to the prosecution's foregoing argument under Nevada Revised Statute § 200.120.

Second, during closing, the prosecution made the following comments about Anderson:

The truth is and common sense we all have dealt with victims of domestic violence. They minimize the abuse committed against them. They always go back to their abuser. We don't know why they do that, but they do and that's exactly what's happening in this circumstance.
. . . .
Amanda, she loves him, she loves him not, she loves him. She's clearly the domestic violence victim that you read about in the paper that you see about whether you know them or not. One day he hits her and she hates him and the next day he loves her sweet baby I'm so sorry and she forgives him wants to take him back. She's conflicted.

ECF No. 21-22 at 75, 103. Scott argues that these comments constitute impermissible expert opinion and impermissible personal knowledge of the prosecutor. ECF No. 15 at 13. Under Nevada law, the question to be answered in determining if something amounts to expert testimony is "does the testimony concern information within the common knowledge of or capable of perception by the average layperson or does it require some specialized knowledge or skill beyond the realm of everyday experience?" *Burnside v. State*, 352 P.3d 627, 636 (Nev. 2015). Here, the prosecutor's statements about domestic violence victims inexplicably getting back together with their abuser likely enters the territory of "specialized knowledge." However, even if Scott's trial counsel acted deficiently by not objecting to the prosecutor's statement, Scott fails to demonstrate

14

prejudice. Had Scott's trial counsel objected and had the trial court sustained the objection and directed the jury to disregard the comment, the jury would merely have been left with its own impression of Anderson and would have had to individually reconcile Anderson's pretrial statements of abuse with her trial testimony denying Scott's abuse. Scott fails to demonstrate that this would have changed the result of his trial, though, given that the evidence of Scott's guilt of committing domestic violence upon Anderson was supported by more than just her statements. Indeed, as is discussed in ground 3, a crime scene analyst, a detective, Vargas, and Price all testified that Anderson had visible bruises on her.

Third, during closing, the prosecution made the following comment:

> We're here because it's your job, it's the State of Nevada's job to seek justice for those victims, to seek justice for the community, for the emergency personnel and for police that used countless resources in order to protect Fernando and Amanda, to seek justice for the children that are involved in this case that have no choice but to be caught up in this unfortunate circumstance. The two and a half month old baby that you saw crying helpless on the bed, the two-year-old that you saw running to the door, the 19-year-old daughter who supports her mom even though her mom makes bad decisions, all of these people deserve justice and that's why we're here, ladies and gentlemen.

ECF No. 21-22 at 78. Scott argues that these comments were meant to inflame the passions of the jury. ECF No. 15 at 14. A prosecutor is not permitted to make comments intended to appeal to jurors' emotions. *See United States v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir. 2005) ("We have consistently cautioned against prosecutorial statements designed to appeal to the passions, fears and vulnerabilities of the jury"); *United States v. Nobari*, 574 F.3d 1065, 1077 (9th Cir. 2009) (finding that "[t]he prosecution's comment was an improper appeal to jurors' emotions and fears"). Although the prosecutor's comments here bordered on the line of being improper appeals to emotion, it appears that these comments regarded the fact that Anderson—while still a victim— did not want to see Scott convicted and the fact that Vargas himself was a felon. *See* ECF No. 21-22 at 77 ("The reason that we're here, ladies and gentlemen, is that the State of Nevada does not get to pick its victims and regardless of whether or not you like these victims, regardless of whether or not they're as sympathetic as you would like to see, that doesn't make the crimes committed by the

Defendant any less egregious."). Therefore, the prosecution does not appear to have implied that the jury should convict Scott on a basis other than the evidence, as Scott contends, but rather it appears that it meant to merely highlight that Scott's crimes affected more than just the immediate (and perhaps unsympathetic) victims.

Because Scott fails to demonstrate improper conduct by the prosecution *and* resulting prejudice under *Strickland*, his ineffective assistance of trial counsel claim is not substantial. Scott fails to overcome the procedural default of ground 1d, so ground 1d is dismissed.

### 8.  *Ground 1e—self-defense argument and jury instruction*

In ground 1e, Scott alleges that his trial counsel was ineffective for failing to effectively argue Nevada's self-defense law and for failing to request a jury instruction explaining the law of self-defense if someone enters a home without permission. ECF No. 15 at 15.

As was stated in ground 1d, Nevada Revised Statute § 200.120(2) provides that "[a] person is not required to retreat before using deadly force . . . if the person: (a) [i]s not the original aggressor; (b) [h]as a right to be present at the location where deadly force is used; and (c) [i]s not actively engaged in conduct in furtherance of criminal activity at the time deadly force is used." Scott fails to demonstrate that his trial counsel should have made an argument and requested a jury instruction based on this statute. Scott testified that he "used to live" at the apartment, moving out in December 2015, but because he still "had the mailbox keys and keys to the house," he moved back in prior to this incident. ECF No. 21-18 at 191. Scott called himself a "borderline squatter." *Id.* at 210. Given that there was evidence that Scott was living at the apartment illegally, it is not readily apparent that Scott "[had] a right to be present at the location where deadly force [was] used." Nev. Rev. Stat. § 200.120(2). This nullifies a basis upon which Scott's trial counsel should have made an argument or requested a jury instruction arguing that Scott was permitted to use deadly force when Vargas entered the apartment. Because Scott's trial counsel was not ineffective, Scott's ineffective assistance of trial counsel claim is not substantial, so Scott fails to overcome the procedural default of ground 1e. Ground 1e is dismissed.

### 9. Ground 1f—impeachment of Vargas

In ground 1f, Scott argues that his trial counsel was ineffective for failing to impeach Vargas with his prior conviction for battery with the use of a deadly weapon resulting in substantial bodily harm. ECF No. 15 at 16. First, contrary to Scott's contention, it is unclear how Vargas's prior conviction supports Scott's theory of self-defense given that there is no evidence that Scott was aware of Vargas's conviction and thus fearful of Vargas. Second, while impeaching Vargas's credibility with his conviction may have been permissible, Scott fails to demonstrate prejudice from his trial counsel's failure to do so. Even if Vargas had been impeached, Anderson confirmed that Scott stabbed Vargas, testifying that she initially believed that Scott only punched Vargas in the back but later learned that Vargas had been stabbed in the back. Given the other evidence of his guilt, Scott fails to demonstrate that the result of his trial would have been different had his trial counsel impeached Vargas. *See Strickler v. Greene*, 527 U.S. 263, 293–94 (1999) (finding no prejudice from evidence impeaching key witness where there was strong evidence for conviction separate from the witness's testimony); *see also Doe v. Ayers*, 782 F.3d 425, 431 (9th Cir. 2015) (concluding that the defendant's trial counsel "could have done a much better job of impeaching [the witness], . . . but the failures regarding impeachment of [the witness] are of comparatively little consequence"). Further, the prosecution asked Vargas during direct examination if he had "been convicted of battery with a deadly weapon resulting in substantial bodily harm," and Vargas answered, "Correct." ECF No. 21-17 at 73. Accordingly, the jury was already aware of Vargas's prior conviction, nullifying any further impeachment value that could have been attained had Scott's trial counsel questioned Vargas about the conviction as well.

Because Scott fails to demonstrate prejudice under *Strickland*, his ineffective assistance of trial counsel claim is not substantial. As such, Scott fails to overcome the procedural default of ground 1e, so ground 1e is dismissed.

**B. Ground 2—trial court's allowance of bad act evidence**

In ground 2, Scott alleges that he was denied his right to a fair trial when the trial court allowed prior bad acts evidence—namely, his prior physical abuse of Anderson—to be admitted in violation of his Fifth, Sixth, and Fourteenth Amendment rights. ECF No. 15 at 17.

### 1. Background

During day three of the trial, a *Petrocelli* hearing was held outside the presence of the jury. ECF No. 21-17 at 13. Vargas testified that before the incident in question, Anderson had told him that "[Scott] kept beating on her." *Id*. at 22. The trial court ruled that the evidence would be admissible:

> [T]he State now wants to admit evidence of the prior bad acts, the alleged prior bad acts of domestic violence by the Defendant against the witness. I think this evidence would be probative here of Ms. Anderson's credibility and also to further explain the relationship between the Defendant and Amanda Anderson and also to help the jury understand why she might have recanted her testimony.
>
> The witness's credibility here, Ms. Anderson, is a critical issue in this case because she's admittedly lied to authorities and she also has firsthand knowledge of the confrontation that's an issue here and she was the complaining witness. So her credibility is super important here and so now this testimony about the alleged prior bad acts is extremely probative.
>
> I don't think that there's any danger of unfair prejudice here to the Defendant because his counsel has already opened the door to the topic of the prior relationship. I further believe there's no undue prejudice because the evidence is coming in, in this case in the middle of the State's case in chief, so it's early enough where the Defendant can still incorporate that information into their strategy in determining what they're going to put on in their case in chief and also in determining whether the Defendant himself is going to testify and also this information can be incorporated into the Defendant's closing argument.
>
> I also feel that there's not going to be any undue prejudice here because I can fashion a limiting instruction. In fact, I think I'm going to give a limiting instruction that says something to the effect of -- and I haven't read the State's proposed yet, but something to the effect that prior accusations are not admitted to prove the Defendant had a propensity to commit domestic violence, but admitted to help the jury assess Amanda's credibility, to help the jury understand why she recanted, and to help to understand the relationship between the Defendant and the witness leading up to and during the events on the date in question.
>
> I think that the – there's further no undue prejudice given that I'm only going to allow testimony regarding alleged domestic violence for just the -- in a six-month period of time prior to the encounter here in question. So it's close in time.

So for all those reasons, I believe that, you know, under 48.045, that the probative value of the evidence greatly outweighs any unfair prejudice. A limiting instruction will be fashioned and so I'm admitting any -- plus I'm finding from what I heard from Mr. Vargas that I believe that there's clear and convincing evidence that Amanda did in fact report to him that there was domestic violence and I believe there's clear and convincing evidence that there was some sort of domestic violence which led to the bruising.

So under 48.045, the Bigpond case that we looked at and Petrocelli, for all those reasons, I'm going to allow the questioning of Mr. Vargas regarding the statements made by the complaining witness and whatever other evidence there is that might come out with respect to this prior bad acts. I'm going to let that in at least through Mr. Vargas. All right. And then we'll hear from Amanda once she comes in and we'll voir dire her outside the presence of the jury and see if she has anything more to add on this.

*Id.* at 39–40.

Later, in front of the jury, Vargas testified that Anderson told him "several times" before the incident in question that she had bruises from Scott, including an incident where Scott "had knocked her out and that she had waken up a little while later from it." *Id.* at 51. The trial court gave the jury the following limiting instruction:

[Y]ou're hearing testimony now from this witness about what's called alleged prior bad acts. These are alleged bad things that supposedly were done or allegedly were done by the Defendant prior to the alleged crime that's charged in this case. All right. You're hearing allegations of domestic violence. All right.

This evidence is coming in not for purposes of showing that Defendant has a propensity of engaging in domestic violence. It's not coming in for that purpose. And it's -- and you're not to infer that even if you were to believe this -- if you were to believe his testimony, you're not to infer that based upon this testimony, Defendant has a bad character or Defendant has a propensity for engaging in domestic violence.

This evidence that you're hearing is coming in for very limited purposes and those purposes are for you to better assess the credibility of the testimony you heard yesterday of Amanda Anderson. It's also coming in for you to assess better the relationship between the Defendant and Amanda Anderson leading up to and at the time of the alleged crime in this case.

And it's also coming in to help you to better understand why Ms. Anderson may have changed her testimony from what she told the police to what she said on the stand here yesterday.

So this evidence of the alleged prior bad act is coming in for those limited purposes, but not for the purpose of you trying to conclude that, you know, if Defendant did bad things before, then he must have done bad things now. It's not coming in for that purpose, all right? It's a fine distinction that the law makes, but I'm required to instruct you on the difference. All right?

*Id.* at 51–52.

### 2. *State court determination*

In affirming Scott's judgment of conviction, the Supreme Court of Nevada ruled as follows:

Scott argues that the district court improperly admitted evidence that he previously committed domestic violence against his girlfriend—the victim in the battery domestic violence count. We disagree. The court can admit evidence of prior bad acts when (1) the evidence is relevant to the charged crime for a nonpropensity purpose, (2) the State proves the prior bad acts by clear and convincing evidence, and (3) the danger of unfair prejudice does not substantially outweigh the probative value of the evidence. *Bigpond v. State*, 128 Nev. 108, 117, 270 P.3d 1244, 1250 (2012). Evidence of prior acts of domestic violence can be relevant and admissible when, during trial, a victim recants pretrial accusations. *See id.* at 110, 270 P.3d at 1246 (explaining that evidence of prior domestic violence may be admissible to give context to a domestic violence relationship, explain a victim's recantation, and assist the jury in evaluating credibility); NRS 48.045(2) (providing examples of purposes for which prior bad acts may be admissible). Here, the girlfriend testified at trial that Scott did not batter her, in contradiction to what she told others at the time the incident. Further, the State presented clear and convincing evidence that Scott previously committed domestic violence against his girlfriend—a witness testified at the *Petrocelli* hearing to seeing bruising on the girlfriend and that the girlfriend attributed it to Scott's abuse.

> [FN3] This was not inadmissible hearsay. The district court properly admitted it as a prior inconsistent statement to the girlfriend's trial testimony. *See* NRS 51.035 (defining hearsay).

The State also proffered that the girlfriend's daughter would substantiate those claims and, indeed, the daughter's later testimony matched the State's proffer, as she testified that her mother ascribed previous bruising to Scott. *See Petrocelli v. State*, 101 Nev. 46, 52, 692 P.2d 503, 508 (1985) (affirming the acceptance of a State's offer of proof regarding evidence supporting a prior bad act when the quality of that evidence was later demonstrated by sworn trial testimony). And, the danger of unfair prejudice did not substantially outweigh the probative value of the evidence where there was sufficient evidence to convict Scott absent the prior bad acts, the district court gave the jury an immediate limiting instruction, and Scott's cross-examination opened the door to the prior bad acts. The district court therefore did not abuse its discretion in admitting the challenged evidence. *See Bigpond*, 128 Nev. at 117, 270 P.3d at 1250 (reviewing a district court's decision to admit or exclude prior-bad-act evidence for an abuse of discretion).

ECF No. 22-13 at 2–3.

### 3. *Standard*

"A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005). "[C]laims deal[ing] with admission of evidence" are "issue[s] of state law," *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009), and "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764 (1990). The issue here is "whether the state proceedings satisfied due process." *Jammal v. Van de Kamp*, 926 F.2d 918, 919–20 (9th Cir. 1991). In order for the admission of evidence to provide a basis for habeas relief, the evidence must have "rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)). Not only must there be "no permissible inference the jury may draw from the evidence," but also the evidence must "be of such quality as necessarily prevents a fair trial." *Jammal*, 926 F.2d at 920 (citation omitted).

### 4. *Analysis*

The introduction of Scott's prior domestic violence against Anderson was undoubtedly detrimental to Scott. However, it cannot be concluded that the admission of this evidence rendered Scott's trial fundamentally unfair in violation of due process. As the Supreme Court of Nevada reasonably concluded, this evidence was admitted for the permissible purpose under Nevada law of explaining Anderson's recantation of pretrial accusations. *See Bigpond v. State*, 270 P.3d 1244, 1246 (Nev. 2012) ("The evidence of prior acts of domestic violence involving the victim and defendant were relevant where the victim recanted her pretrial accusations against the defendant because the evidence placed their relationship in context and provided a possible explanation for the recantation, which assisted the jury in evaluating the victim's credibility."). Indeed, Anderson initially told a detective at the scene that Scott had previously given her the many bruises that were present on her body. *See* ECF No. 21-18 at 135. However, at trial, Anderson testified that most of her bruises were *not* from Scott. ECF No. 21-16 at 140. Consequently, because

Anderson's credibility was central to this case, Scott's prior domestic violence against her was relevant under Nevada law to explain the possible basis behind her recantation at trial.

Further, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Yarborough*, 568 F.3d at 1101 (citing 28 U.S.C. § 2254(d)); *see also Dowling v. United States*, 493 U.S. 342, 352 (1990) (explaining that the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly"). And importantly, the Supreme Court "has not yet made a ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id.*

Accordingly, the Supreme Court of Nevada's denial of relief on this claim during was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts, so Scott is not entitled to federal habeas relief for ground 2.

### C.  Ground 3—insufficient evidence

In ground 3, Scott alleges there was insufficient evidence presented, so he was denied a fair trial in violation of the Fifth, Sixth, and Fourteenth Amendments. ECF No. 15 at 24.

#### 1.  *State court determination*

In affirming Scott's judgment of conviction, the Supreme Court of Nevada ruled as follows:

> Scott argues that the State presented insufficient evidence to support his convictions. Viewing the evidence in the light most favorable to the State, there is sufficient evidence to establish guilt beyond a reasonable doubt as determined by a rational trier of fact. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Mitchell v. State*, 124 Nev. 807, 816, 192 P.3d 721, 727 (2008). The battery domestic violence charge was supported by physical evidence, witnesses' testimony regarding the girlfriend's injuries and their knowledge of her relationship with Scott, as well as admissions by Scott that he held and grabbed the girlfriend. *See* NRS 200.481 (defining battery); NRS 200.485 (defining battery constituting domestic violence); NRS 33.018 (defining acts constituting domestic violence). And the stabbing victim testified that Scott stabbed him in the shoulder and, after threatening to kill him, stabbed him again in the stomach, which was bolstered by physical evidence and medical personnel testimony, supporting the convictions on the remaining charges. *See* NRS

200.481 (defining battery); NRS 200.010 (defining murder); NRS 200.030 (delineating the degrees of murder); NRS 193.330 (defining attempt); NRS 193.165 (penalty for deadly weapon use). The fact that Scott presented contradictory evidence does not change this conclusion. *See Walker v. State*, 91 Nev. 724, 726, 542 P.2d 438, 439 (1975) ("[I]t is the function of the jury, not the appellate court, to weigh the evidence and pass upon the credibility of the witness.").

ECF No. 22-13 at 4–5.

### 2. *Standard*

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A federal habeas petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review of a sufficiency of the evidence claim, a state court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The evidence is to be viewed "in the light most favorable to the prosecution." *See id*. Federal habeas relief is available only if the state-court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of *Jackson. See Juan H.*, 408 F.3d at 1275 n.13. Sufficiency of the evidence claims are judged by the elements defined by state law. *Jackson*, 443 U.S. at 324 n.16.

First, Scott challenges the evidence used to sustain his conviction for battery with the use of a deadly weapon resulting in substantial bodily harm. Under Nevada law, battery "means any willful and unlawful use of force or violence upon the person of another." Nev. Rev. Stat. § 200.481(1)(a). Substantial bodily harm means: "(1) Bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss of impairment of the function of any bodily member or organ; or (2) Prolonged physical pain." Nev. Rev. Stat. § 0.060. And "within the context of battery, 'deadly weapon' includes an instrument which, under the

circumstances in which it is used, is readily capable of causing substantial bodily harm or death." *Rodriguez v. State*, 407 P.3d 771, 772 (Nev. 2017).

Second, Scott challenges the evidence used to sustain his conviction for attempted murder with the use of a deadly weapon. Under Nevada law, attempted murder with use of a deadly weapon occurs when a person has the specific intent to kill another human being with a deadly weapon and tries, but fails, to complete the murder. Nev. Rev. Stat. §§ 200.010, 200.030, 193.165.

Third, Scott challenges the evidence used to sustain his conviction for battery constituting domestic violence. Under Nevada law, "[d]omestic violence occurs when a person commits [battery] against or upon . . . any . . . person with whom the person has had or is having a dating relationship." Nev. Rev. Stat. § 33.018(1)(a). And, as provided before, battery "means any willful and unlawful use of force or violence upon the person of another." Nev. Rev. Stat. § 200.481(1)(a).

### 3.  *Analysis*

First, Scott argues there was insufficient evidence of battery with use of a deadly weapon because "no reasonable jury could have found that the superficial injury to Vargas' shoulder was the result of being stabbed with a knife." ECF No. 15 at 25. Even if this is true, the second amended information stated that the battery with use of a deadly weapon resulting in substantial bodily harm count was from stabbing Vargas "in the back and/or abdomen." ECF No. 21-14 at 3. And in support of this ground, the prosecution presented evidence from (1) Vargas, who testified that Scott "stabbed [him] in [his] stomach," ECF No. 21-17 at 61, and (2) the doctor who treated Vargas, who testified that Vargas suffered "a penetrating wound to the abdomen" from an instrument that "had sharp edges consistent with a sharp object," ECF No. 21-17 at 127. Viewing this evidence "in the light most favorable to the prosecution," *Jackson*, 443 U.S. at 319, the Supreme Court of Nevada reasonably determined that a rational trier of fact could have found beyond a reasonable doubt that Scott committed battery with the use of a deadly weapon resulting in substantial bodily harm. *In re Winship*, 397 U.S. at 364; *Juan H.*, 408 F.3d at 1274; Nev. Rev. Stat. § § 200.481(1)(a), 0.060.

Second, Scott argues that "the weight of the evidence suggests that [he] was acting in self-defense when he stabbed Vargas" in the stomach, so the prosecution failed to prove that he had the intent to kill Vargas. ECF No. 15 at 26–27. This is rebutted by Vargas's testimony that before Scott stabbed him, Scott said "that he was going to kill [him]." ECF No. 21-17 at 61. Given that the jury was permitted to believe Vargas's testimony over Scott's testimony, which notably is dissimilar to his argument here—*i.e.*, he testified that he left the scene before Vargas was stabbed in the stomach versus his argument now that he stabbed Vargas in the stomach in self-defense—the Supreme Court of Nevada reasonably determined that a rational trier of fact could have found beyond a reasonable doubt that Scott committed attempted murder with the use of a deadly weapon. *In re Winship*, 397 U.S. at 364; *Juan H.*, 408 F.3d at 1274; Nev. Rev. Stat. §§ 200.010, 200.030, 193.165.

Third, Scott argues that the prosecution's evidence showing that he committed domestic violence against Anderson consisted only of hearsay, inconsistent statements, and uncorroborated accusations. ECF No. 15 at 27. Although no witness testified that they witnessed Scott batter Anderson, the prosecution was not required to present such evidence. Rather, Scott's domestic violence conviction was supported by testimonies of various witnesses, including a crime scene analyst, a detective, and Vargas, who all testified that Anderson had visible bruises on her and told them that Scott had physically abused her. *See* ECF Nos. 21-16 at 57, 21-18 at 135, 21-17 at 54. Even if Anderson later recanted these statements, the Supreme Court of Nevada reasonably determined that a rational trier of fact could have found beyond a reasonable doubt that Scott committed domestic violence because direct evidence of Scott's abuse was not required. *See Buchanan v. State*, 69 P.3d 694, 705 (Nev. 2003) ("Circumstantial evidence alone can certainly sustain a criminal conviction."); *In re Winship*, 397 U.S. at 364; *Juan H.*, 408 F.3d at 1274; Nev. Rev. Stat. §§ 33.018(1)(a), 200.481(1)(a).

In sum, the Supreme Court of Nevada's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts. Scott is not entitled to federal habeas relief for ground 3.

## D.  Ground 4—prosecutorial misconduct

In ground 4, Scott alleges that the prosecution made improper closing arguments in violation of his Fifth, Sixth, and Fourteenth Amendment rights. ECF No. 15 at 28.

### 1.  *Background information*

As was discussed in ground 1d, during closing, the prosecution made the following comments about Anderson:

> The truth is and common sense we all have dealt with victims of domestic violence. They minimize the abuse committed against them. They always go back to their abuser. We don't know why they do that, but they do and that's exactly what's happening in this circumstance.
>
> . . . .
>
> Amanda, she loves him, she loves him not, she loves him. She's clearly the domestic violence victim that you read about in the paper that you see about whether you know them or not. One day he hits her and she hates him and the next day he loves her sweet baby I'm so sorry and she forgives him wants to take him back. She's conflicted.

ECF No. 21-22 at 75, 103.

### 2.  *State court determination*

In affirming Scott's judgment of conviction, the Supreme Court of Nevada ruled as follows:

> Scott argues that the State committed prosecutorial misconduct during its closing argument. "When considering claims of prosecutorial misconduct, this court engages in a two-step analysis. First, we must determine whether the prosecutor's conduct was improper. Second, if the conduct was improper, we must determine whether the improper conduct warrants reversal." *See Valdez v. State*, 124 Nev. 1172, 1188, 196 P.3d 465, 476 (2008). We agree with Scott that the State telling the jury during its closing how domestic violence victims typically act was impermissible expert opinion and outside the evidence—particularly because the district court sustained Scott's objection and admonished the jury to disregard the State's similar opening statement. *See Yates v. State*, 103 Nev. 200, 205, 734 P.2d 1252, 1255 (1987) (concluding that it is improper for the prosecutor to transform into an unsworn witness during final argument); *Rose v. State*, 123 Nev. 194, 209, 163 P.3d 408, 418 (2007) (holding that the State committed prosecutorial misconduct by referring to facts not in evidence). Scott did not object, however, and has not demonstrated that this error affected his substantial rights or the jury's verdict, especially in light of the strong evidence supporting the verdict. *See Valdez*, 124 Nev. at 1190, 196 P.3d at 477 (reviewing unpreserved prosecutorial misconduct claims for plain error). This error therefore does not warrant reversal. Because we perceive only one error, reversal is not warranted for cumulative error. *See United States v. Sager*, 227 F.3d 1138, 1149 (9th Cir. 2000) ("One error is not cumulative error.").

ECF No. 22-13 at 5–6.

### 3. Standard

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In making that determination, this court looks to various factors: "the weight of the evidence, the prominence of the comment in the context of the entire trial, whether the prosecution misstated the evidence, whether the judge instructed the jury to disregard the comment, whether the comment was invited by defense counsel in summation and whether defense counsel had an adequate opportunity to rebut the comment." *Floyd v. Filson*, 949 F.3d 1128, 1150 (9th Cir. 2020). Relief is warranted only if the misconduct "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993).

### 4. Analysis

As the Supreme Court of Nevada reasonably determined and as was discussed in ground 1d, the prosecutor's comments about domestic violence victims inexplicably returning to their abuser were improper. *See Yates v. State*, 734 P.2d 1252, 1255 (Nev. 1987) (explaining that it is improper for a "prosecutor [to act as] an unsworn witness" during closing argument). However, as the Supreme Court of Nevada also reasonably determined, Scott fails to demonstrate that he is entitled to relief. The jury was instructed that "[s]tatements, arguments and opinions of counsel are not evidence in the case." ECF No. 21-20 at 9. This court presumes that the jury following this instruction. *Doe v. Busby*, 661 F.3d 1001, 1017 (9th Cir. 2011). Moreover, the prosecution presented substantial evidence of Scott's guilt, weakening the impact of the prosecutor's comments on the jury's verdict. *See Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2005) (finding that prosecutorial misconduct did not amount to a due process violation where the trial court gave an instruction

27

that the attorneys' statements were not evidence and where the prosecutors presented substantial evidence of the defendant's guilt). Because the Supreme Court of Nevada's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts, Scott is not entitled to federal habeas relief for ground 4.

### E.   Ground 5—rejection of jury instructions

In ground 5, Scott alleges that the trial court erred by refusing his proposed jury instruction in violation of his Fifth, Sixth, and Fourteenth Amendment rights. ECF No. 15 at 29.

#### 1.   *Background information*

Jury Instruction No. 23 provided as follows:

> The right of self-defense exists only as long as the real or apparent threatened danger continues to exist. When such danger ceases to appear to exist, the right to use force in self-defense ends.
> Actual danger is not necessary to justify an act in self-defense. A person has a right to defend himself or others from apparent danger to the same extent as he would from actual danger. The person is justified in acts of self-defense if:
> 1.    He or she is confronted by the appearance of imminent danger which arouses in a person's mind an honest belief and fear that they or someone else is about to be killed or suffer great bodily injury; and
> 2.    He or she acts solely upon these appearances and his fear and actual beliefs;
> 3.    A reasonable person in a similar situation would believe themselves or someone else to be in like danger.
> The acts of self-defense are justified even if it develops afterward that the person was mistaken about the extent of the danger.

ECF No. 21-20 at 26.

Scott's trial counsel opposed "the first paragraph" of Jury Instruction No. 23, arguing that "it's vague." ECF No. 21-22 at 38. The trial court overruled the objection, explaining that "it is an accurate statement of the law." *Id*. at 49.

#### 2.   *Standard*

Issues relating to jury instructions are not cognizable in federal habeas corpus unless they violate due process. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). The question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

process', . . . not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973)). And significantly, when reviewing a jury instruction, this court considers that jury instruction "in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72; *see also United States v. Frega*, 179 F.3d 793, 806 n.16 (9th Cir. 1999) ("In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation.").

### 3.   *State court determination*

In affirming Scott's judgment of conviction, the Supreme Court of Nevada ruled as follows:

> Scott argues that the district court erred by refusing to give his proposed jury instruction on self-defense, but he neither specifically proffered one to the district court nor provides one in his briefing on appeal. And, during trial, Scott conceded that the State's proposed self-defense instruction correctly stated the law, only arguing it was vague. On this record, we conclude that the district court did not abuse its discretion in giving the challenged instruction. *See Crawford v. State*, 121 Nev. 744, 748, 121 P.3d 582, 585 (2005) (reiterating district courts' broad discretion to settle jury instructions and that this court reviews for an abuse of that discretion or judicial error).

ECF No. 22-13 at 4.

### 4.   *Analysis*

Scott argues that the trial court prevented him from establishing his self-defense defense theory by denying his proposed instructions. *See Mathews v. United States*, 485 U.S. 58, 63 (1988) ("As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."). However, as the Supreme Court of Nevada reasonably noted, Scott never proffered a jury instruction. Rather, he merely objected to Jury Instruction No. 23 as being vague. However, not only does Scott fail to articulate how Jury Instruction No. 23 was vague, but it also appears that Jury Instruction No. 23 was an accurate reflection of Nevada law. *See, e.g., Runion v. State*, 13 P.3d 52, 59 (Nev. 2000) ("Actual danger is not necessary to justify a killing in self-defense. A person has a right to defend from

apparent danger to the same extent as he would from actual danger."). Because Scott fails to demonstrate that the trial court's giving of Jury Instruction No. 23 resulted in his conviction violating due process, the Supreme Court of Nevada's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts. Scott is not entitled to federal habeas relief for ground 5.

## IV.    Certificate of Appealability

This is a final order adverse to Scott. Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). I have sua sponte evaluated the claims within the amended petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Applying these standards, I find that a certificate of appealability is unwarranted.

## V.    Conclusion

It is therefore ordered that the first-amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 **[ECF No. 15] is denied**.

It is further ordered that a certificate of appealability is denied.

It is further kindly ordered that the Clerk of Court enter judgment and close this case.

Dated:  March 16, 2026

_____
Cristina D. Silva
United States District Judge